IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| AMERISERV FINANCIAL BANK, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 07-1159 |
| | ) | |
| COMMERCEBANK, N.A., | ) | Magistrate Judge Lisa Pupo Lenihan |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION**

**I. CONCLUSION**

For the reasons set forth below, the Plaintiff's Motion for Partial Summary Judgment will be granted.

**II. FACTUAL BACKGROUND**

In late December, 2006, Defendant Commercebank, N.A. ("Commercebank") began commercial financial transactions with a Texas limited liability corporation called Biotechnologies, which it believed to be owned by entities including Callahan & Chase, LLC ("C&C"), and to have a Board of Directors including W. Scott Callahan ("Callahan"). See

Defendant's Responsive Concise Statement of Material Facts ("Responsive Concise Statement") at ¶¶ 1-7. Principles and Directors of Biotechnologies represented to Commercebank that the company was doing business with Thermo Fisher Scientific ("Thermo Fisher"), and that the latter anticipated purchases of approximately $30 Million per annum. Purported Thermo Fisher corporate resolutions and other documents were provided in support of these and further representations. The purported correspondence from Thermo Fisher directed any additional questions to Callahan. In January, 2007 Commercebank advanced monies to Biotechnologies - for the purchase of what it believed to be legitimate product invoices to Thermo Fisher - in the amounts of $1,750,360 and $997,500. See id. at ¶¶ 8-23.

The first payment on these transactions was due in February, 2007 and not received. See Plaintiff's Concise Statement of Material Facts ("Plaintiff's Concise Statement") at ¶ 36 and Exhibit 4 to Plaintiff's Brief in Support of Motion for Summary Judgment ("Plaintiff's Brief in Support").[1] On March 19, 2007, Commercebank received a $700,000 wire transfer from an entity called Fisher Care Company ("Fisher Care"); on March 26, 2007, the bank received a second wire transfer of $153,675 from the same entity. See Responsive Concise Statement at ¶¶ 27-28.

On April 25, 2007, Commercebank received correspondence from Thermo Fisher's deputy general counsel informing Commercebank that Thermo Fisher had no business relationship with Biotechnologies, it neither purchased nor received any product, the documents were forgeries, and the matter had been turned over to the FBI. See id. at ¶ 29 and Exhibit 11

---

1. The Court finds that Plaintiff's initial failure to file a separate Concise Statement of Facts caused no prejudice to Defendant. See Memorandum of Law in Opposition at 3-4; Plaintiff's Reply to Commercebank's Memorandum of Law in Opposition at 4.

(Letter from Thermo Fisher). Commercebank spoke with the FBI, Callahan and Thermo Fisher that same day, and retained outside legal representation from Bryan Dumesnil ("Dumesnil" or "Commercebank's Counsel"). See id. at ¶¶ 30-32.

At approximately the same time, *i.e.*, late April, 2007, Callahan approached Ameriserv bank in Pennsylvania, for loans on behalf of C&C and CalChaseMed, LLC ("CCM"), of which he asserted to be President, and which he represented to require working capital to complete a $1,745,040 purchase order from Home Depot.[2] As with the monies solicited from Commercebank, documentation purportedly supportive of the underlying business transactions was provided. See Plaintiff's Concise Statement at ¶¶ 2-6. Ameriserv issued a Commitment Letter for an $875,000 secured working capital bridge loan and a $2M secured working capital line of credit. See id. at ¶¶ 6-7.

On May 11, 2007, Commercebank, through its Counsel, filed litigation in Texas State Court against Callahan, C&C, CCM, Biotechnologies, and others alleging that its financing agreements were in default,[3] and that the underlying transactions were rife with fraud and forgeries. The Complaint further alleges that "Fisher Care" was simply "a fictitious name for" the Callahan entity CCM. See Exhibit 4 to Plaintiff's Brief in Support of Motion for Summary Judgment (Texas Complaint).

---

2. Callahan & Chase, LLC and CalChaseMed, LLC are Pennsylvania limited liability companies. See Complaint at ¶ 1.

3. Cf. 12 Pa.C.S.A. § 5102 ("[A] debtor who is generally not paying [his] debts as they become due is presumed to be insolvent."); Fidelity Trust Co. v. Union National Bank of Pittsburgh, 313 Pa. 467, 160 A.2d 209 (1933) (stating that test of insolvency is inability to pay debts as they come due in ordinary course).

On May 14, 2007, Commercebank's Counsel had telephone and e-mail communication from Callahan attaching a May 11, 2007 Commitment Letter from Plaintiff Ameriserv to C&C and CCM in the total amount of $2,875,000 (the "Ameriserv Commitment Letter"). See Responsive Concise Statement at ¶¶ 37-40. "The purpose of the Commitment Letter was 'to provide working capital, specifically to support a purchase order from Home Depot (PO #03032579)'." Id. at ¶ 40. Commercebank represents that the purpose of Callahan's presentation of the Commitment Letter was to demostrate that "Callahan was legitimate, still in business, capable of receiving funds from a bank and was not a fraud." Id. at ¶ 41. The May 14th email from Callahan providing the Ameriserv Commitment Letter to Commercebank's Counsel states:

> Per our conversation I have attached our commitment letter. The documents are being drawn up today and tomorrow and we should sign either Weds or Thurs. Can you please call me after reviewing this document so that we can discuss the timing. Also, you said you would keep this confidential so that we can resolve the current issue at hand.

See Deposition Testimony of Bryan S. Dumesnil and Exhibits thereto.[4]

The Ameriserv documents were provided to Commercebank. Id. at 17. Commercebank's Criticized Asset Report indicates that "[o]n 5/14/07, Scott Callahan set to [Dumesnil] a commitment letter from Ameriserv Financial to evidence he was working to get the funds to repay Commercebank." Id. at 19 and Exhibit 6. In addition, Nathan Kutt ("Kutt"), Commercebank's Senior Vice President and General Counsel, and designated Rule 30(b)(6)

---

4. Dumesnil's testimony is that when Callahan said he'd like the matter kept "just between us to see if we can get [it] resolved", Dumesnil responded that he couldn't "make any promises." Id. at 14. His contemporaneous notes indicate that Callahan was "given a line of credit" and that the "situation will get resolved." Id. at 12.

4

representative, has testified that Callahan told Commercebank that a $700,000 payment would be "coming pursuant to the commitment letter." Deposition of Nathan Kutt at 21.[5]

On May 18, 2007, Callahan executed and delivered to Ameriserv the borrowing entities' promissory note for $875,00, and proceeds of $869,405 were wired by Plaintiff to an account of CCM at PNC Bank. See Plaintiff's Concise Statement at ¶¶ 8-9. That same day, Commercebank received a third wire transfer from Fisher Care in the amount of $700,000. It contacted the FBI and was told by an Agent that it could accept the payment "because all of the facts surrounding the[ ] entities and transactions were not yet fully understood", i.e., the criminal investigation was ongoing. See Memorandum of Law in Opposition at 9; Responsive Concise Statement at ¶¶ 34-35.[6]

Defendant has acknowledged that this $700,000 payment was from proceeds received pursuant to Ameriserv's transactions with Callahan. See Plaintiff's Complaint at Paragraph 17 and Defendant's Answer thereto.[7] In addition, Kutt has testified that Commercebank was "curious where the $700,000 came from" and had "concerns that the source of [the $700,000 was] from Ameriserv pursuant to the Commitment Letter" because Commercebank "had a commitment letter and [it] got paid." See Deposition of Nathan Kutt at pp. 49, 58. Finally, Kutt attests that Commercebank undertook no investigation but to see that the monies were wired out

---

5. But see id. at 48 (testifying that Callahan "never said 'pursuant to this line, you're going to get the money'").

6. See also Deposition of Nathan Kutt at 44 (identifying May 24, 2007 meeting with FBI Agent Hawkins); id. at 55 (stating that Kutt had a conversation with FBI Agent Albert when it received the Ameriserv Commitment Letter and that Agent Albert said "if he pays you, then we'll figure out the rest as [the] FBI").

7. Cf. Deposition of Nathan Kutt at 61 (discussing internal document entry of May 18 stating: "We received partial payment for 700,000 on Fisher Care, one of Mr. Callahan's companies.").

of a Fisher Care account; it made no inquiry to Callahan as to the source of the funds nor did it contact Ameriserv regarding its concerns that the funds represented Ameriserv Commitment Letter financing. Id. at p. 59.

Plaintiff's August 23, 2007 Complaint in this matter asserts claims under the Pennsylvania Uniform Fraudulent Transfer Act, 12 Pa.C.S.A. § 5104 *et seq.* ("PUFTA"), and for common law conversion. The essential components of Plaintiff's Motion for Partial Summary Judgment are as follows:

(a) Callahan and/or CCM dispursed $700,000 from its Ameriserv transaction to Commercebank with actual intent to defraud Ameriserv in violation of § 5104(a)(1) of the PUFTA and Plaintiff is therefore entitled to avoidance of the transfer or other appropriate relief under §5107; and

(b) Under the affirmative defense of § 5108, Commercebank bears the burden of proving that it received the funds (i) in good faith and (ii) in exchange for reasonably equivalent value, and Commercebank cannot meet its burden as to the first of these elements.

### III. MOTION FOR PARTIAL SUMMARY JUDGMENT

Summary judgment is appropriate where the Court is satisfied "that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party has the burden of demonstrating that no genuine issue of fact exists. See Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The Court's role in deciding a Motion for Summary Judgment is not to weigh the evidence, but to determine whether the facts are so one-sided that one party must prevail as a matter of law. See Anderson

6

v. Liberty Lobby, Inc., 477 U.S. 242, 247-52 (1986); In re Burry, 309 B.R. 130, 134 (Bankr. E.D. Pa. 2004). In making this determination, the Court considers the evidence presented and draws all reasonable inferences therefrom in the light most favorable to the nonmoving party. Id.

To successfully oppose entry of summary judgment, the nonmoving party must designate specific factual averments through the use of permissible evidentiary material that demonstrate a triable factual dispute. Such evidence must be sufficient to support a jury's factual determination in its favor. Anderson, 477 U.S. at 247-50; Burry, 309 B.R. at 134. Evidence that merely raises some metaphysical doubt regarding the validity of a material fact is insufficient to satisfy the nonmoving party's burden. See Matsushita Electric Indust. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the nonmoving party fails to adduce sufficient evidence in connection with an essential element of the case for which it bears the burden of proof at trial, the moving party is entitled to entry of summary judgment in its favor as a matter of law. Celotex, 477 U.S. at 322-23. See also Matsushita, 475 U.S. at 587 (holding that if the record in its entirety could not lead a rational trier of fact to find for the non-movant, then no genuine issue remains for trial); Anderson, 477 U.S. at 254 (defining question as "whether a reasonable jury could find that the party which bears the evidentiary burden at trial with respect to a . . . defense proved its case 'by the quality and quantity of evidence required by the governing law . . . '").

## IV. STATUTORY PROVISIONS

The PUFTA, enacted in 1993, provides creditors with certain remedies, including avoidance, when a debtor makes a fraudulent transfer. Under § 5104, a transfer may be fraudulent as to present or future creditors if the debtor made the transfer (1) "with actual intent to hinder, delay or defraud any creditor of the debtor" or (2) "without receiving a reasonably equivalent value in exchange for the transfer or obligation". Thus, the first provision of § 5104 provides for liability under an actual intent theory, while the second is a constructive fraud provision. See In re Blatstein, 192 F.3d 88, 96 (3d Cir. 1999).

Once the creditor establishes the existence of a fraudulent transfer or obligation, it may, *inter alia*, avoid the transfer, attach the transferred assets or other property of the transferee, obtain an injunction barring further transfers, or seek appointment of a receiver over the transferred asset. See United States v. Rocky Mountain Holdings, Inc., 2009 WL 564437 (E.D. Pa. Mar. 4, 2009); 12 Pa. C. S. § 5107.

If a debtor acts with fraudulent intent, relief may still be denied, however, if the transferee "took in good faith and for a reasonably equivalent value." 12 Pa. C.S. § 5108.[8] As Plaintiff correctly notes, the good faith defense in the PUFTA is an affirmative defense, meaning that the transferee bears the burden of proof. See Plaintiff' Brief in Support at 2; In re Burry, 309

---

8. See also Committee Comment (6) to § 5108 (stating that "'good faith' means that the transferee . . . (a) acted without actual fraudulent intent and . . . (b) did not collude with the debtor *or otherwise actively participate in the fraudulent scheme*") (emphasis added); id. (further stating that while "knowledge of a transferor's insolvency, in and of itself, is insufficient to support a finding that the transferee. . . lacked 'good faith' . . . [such knowledge] may, however, in combination with the transferee's . . . knowledge concerning other facts, be relied upon as evidencing a lack of 'good faith'"). Under Pennsylvania law, committee comments "may be consulted in the construction or application of the original provisions of the statute . . . ." 1 Pa.C.S.A. § 1939.

B.R. 130 (Bankr. E.D. Pa. 2004); Chorost v. Grand Rapids Fctor Showrooms, Inc., 77 F.Supp. 276, 280 (D.N.J. 1948), *aff'd,* 172 F.2d 327, 329 (3d Cir. 1949).

## V. ANALYSIS

### A. § 5104 - Debtor Made Transfer with Actual Intent to Defraud a Creditor

For claims of actual fraud under § 5104(a)(1), whether or not the debtor had "actual intent" to hinder, delay or defraud a creditor is a question of fact. See Universal Computer Consulting, Inc. v. Pitcairn Enterprises, Inc., 2005 WL 2077269, *7 (E.D. Pa. Aug. 26, 2005) (citing United States v. Tabor Ct. Realty Corp., 803 F.2d 1288, 1304 (3d Cir. 1986)); Tiab Commc'ns Corp. v. Keymarket of NEPA, Inc., 263 F.Supp.2d 925, 934 (M.D. Pa. 2003) ("The existence of fraudulent intent may be inferred from all facts and circumstances surrounding the conveyance.").[9]

As outlined above, on May 18, 2007, Plaintiff provided funds in excess of $850,000 by wire transfer to CCM in accordance with a recent Commitment Letter expressly tied to a

---

9. Cf. In re Sherman, 67 F.3d 1348 (8th Cir. 1995) (noting that determination of actual fraudulent intent is a factual finding).

The PUFTA supplies a non-exclusive list of factors which includes: disclosure/concealment of the transfer or obligation; the debtor had been sued or threatened with suit before the transfer was made or obligation was incurred; the transfer was of substantially all the debtor's assets; the debtor was insolvent or became insolvent shortly thereafter; and the transfer occurred shortly before or after a substantial debt was incurred. See 12 Pa. C.S. § 5104(b). See also In re Bayou Group, LLC, 396 B.R. 810 (Bankr. S.D.N.Y. 2008) (holding that under fraudulent transfer provisions of both Bankruptcy Code and New York's fraudulent transfer law, actual intent may be proven by circumstantial evidence, commonly referred to as "badges of fraud"); In re Sherman, 67 F.3d at 1353 ("[T]he confluence of several [badges of fraud] can constitute conclusive evidence of an actual intent to defraud, absent 'significantly clear' evidence of a legitimate supervening purpose.") (quoting Max Sugarman Funeral Home, Inc. v. A.D.B. Investors, 926 F.2d 1248, 1254-55 (1st Cir. 1991)); id. at 1357 (holding three badges sufficient).

9

purported purchase order with Home Depot. That same day, $700,000 was wire transferred, through a "Fisher Care" account (a fictitious name for CCM), to Commercebank in response to Texas litigation arising from Callahan-related defaults to that bank. Callahan had previously communicated to Commercebank his pursuit of Ameriserv funding to repay Commercebank and his request that Commercebank keep his communications confidential to enable repayment. The fraudulent intent of these actions is self-evident, particularly in the full context set forth in the factual history. Cf. In re Bayou Group, 396 B.R. 810, 827 (Bankr. S.D.N.Y. 2008) ("It is sufficient for a plaintiff to demonstrate that the transferor 'acted under circumstances that preclude any reasonable conclusion other than that the purpose of the transfer was fraudulent as to creditors.'") (quoting 5 Collier on Bankruptcy ¶ 548.04[1] at 548-26 (15th ed. rev. 2006)).[10] Plaintiff has established its *prima facie* case, subject to Defendant's affirmative defense, if any.

### B. § 5108 - Transferor Took in Good Faith and for Reasonably Equivalent Value

There being no dispute that Commercebank took for reasonably equivalent value (*i.e.*, in repayment of valid debt), the question before the Court is whether Plaintiff is entitled to partial summary judgment on grounds that Defendant cannot reasonably evidence that it took in "good faith".

The Bankruptcy Court for the Eastern District of Pennsylvania, in interpreting the PUFTA, has recently reiterated the well-recognized principle that a fraudulent transfer "good faith" defense is evaluated on a case-by-case basis, looking to "what the transferee objectively 'knew or should have known', such that [it] does not act in good faith when it has sufficient

---

10. Cf. also In re Blatstein, 192 F.3d 88, 96 (3d Cir. 1999) (noting that transaction falls within fraudulent transfer statute even if debtor intended to defraud one creditor to pay another) (citing In re Greene, 202 B.R. 68, 73 (Bankr. D. Md. 1996)).

knowledge to place it on inquiry notice of the voidability of the transfer." In Re Burry, 309 B.R.at 136 (quoting In re Sherman, 67 F.3d 1348, 1355 (8th Cir. 1995) and discussing action for recovery under PUFTA and the Bankruptcy Code).[11]

As the Burry Court has also noted, the fraudulent transfer provisions of the Bankruptcy Code[12] and PUFTA "mirror each other in terms of causes of action and share a common affirmative defense". In re Burry, 309 B.R. at 134-35; id. at 135 (noting that "[t]he two defenses . . . require proof of two elements": "innocence on the part of the transferee" and "an exchange of value").[13]

The leading related case in this Circuit is therefore In re Bressman, 327 F.3d 229 (3d Cir. 2003), in which the Third Circuit held that if a subsequent transferee has "knowledge of facts that suggest a transfer may be fraudulent, and further inquiry by [him] would reveal facts sufficient to alert him that the property is recoverable, he cannot sit on his heels", rather, in such situation, the transferee is held to have knowledge of the voidability of the transfer for purposes

---

11. Compare Memorandum of Law In Opposition at 11 ("Plaintiff also has the burden of proving that Commercebank knew that Plaintiff was providing funds pursuant to the Commitment Letter . . . .").

12. See 11 U.S.C. § 548 *et seq*.

13. See also Fidelity Mortgage Co. v. Brand, 371 B.R. 708, 719 (E.D. Pa. 2007) (explaining that when drafting UFTA, authors looked to the Bankruptcy Code and modeled provisions thereon, including when good faith defenses apply) (citing Michael L. Cook & Richard E. Mendales, The Uniform Fraudulent Transfer Act: An Introductory Critique, 62 Amer. Bankr. L.J. 87 (1988)); In re Agricultural Research & Tech. Group, 916 F.2d 528, 535-36 (9th Cir. 1990) (recognizing that UFTA good faith affirmative defense provision is interpreted the same as that under Bankruptcy Code); Terry v. June, 432 F.Supp.2d 635, 641 (W.D.Va. 2006) (noting that UFTA and § 548 of the Bankruptcy Code are "nearly identical . . . and subject to the same analysis) (citations omitted); In re Agricultural Research and Tech. Group, 916 F.2d 528 (9th Cir. 1990) (holding that cases construing Bankruptcy Code counterparts to applicable state law governing fraudulent conveyances were persuasive authority); id. at 535 (describing § 548(c) of the Bankruptcy Code as "the equivalent of" Hawaii's codification of UFTA's good faith defense).

of the Bankruptcy Code provisions permitting recovery. See 327 F.3d at 236-37 (citations omitted). See also id. at 237 (explaining that "because some facts strongly suggest the presence of others, a subsequent transferee that closes its eyes to the remaining facts may not deny knowledge"); id. at 237, 239 (finding no liability where Plaintiff "came forward with no probative evidence" that "facts known to [transferees] and reasonable inferences drawn therefrom would not have affirmatively suggested to a reasonable person in their position that they were receiving assets" that originated from improper source); id. (describing issue as the "good faith no-knowledge issue").[14]

The holdings in this Circuit comport with the generally-accepted analysis of a good faith defense under the related provisions of either the Bankruptcy Code or the Uniform Fraudulent Transfers Act ("UFTA"). See In re Bayou Group, 396 B.R. at 844-45 (concurring that federal courts have reached a consensus that "good faith" under the Bankruptcy Code provisions is determined according to an "objective" or "reasonable person" standard and not on the subjective knowledge or belief of the transferee, and that under this standard the "courts look to what the transferee objectively 'knew or should have known'"); id. (citing extensively to case law, including cases interpreting/analyzing "analogous" provisions under UFTA);[15] id. at 845 (noting that transferee "cannot be found to have taken a transfer in good faith 'if the circumstances would

---

14. Cf. In re Nordic Village, Inc., 915 F.2d 1049, 1056 (6th Cir, 1990), *rev'd on other grounds sub nom.*, United States v. Nordic Village, Inc., 503 U.S. 30 (1992) (affirming voidability of transfer where facts gave rise to an inference of inquiry notice against defendant). In Nordic Village, the IRS was not entitled to the affirmative defense where it accept a cashier's check for personal tax liability and the check indicated that the remitter was a bankrupt corporation.

15. See, *e.g.*, Warfield v. Byron, 436 F.3d 551, 559-60 (5th Cir. 2006) (analyzing provision under UFTA); In re Agric. Research., *supra*; Terry v. June, 432 F.Supp.2d 635, 641 (W.D. Va. 2006) (analyzing analogous provision under UFTA as codified in Florida and Michigan).

place a reasonable person on inquiry of a debtor's fraudulent purpose, and a diligent inquiry would have discovered the fraudulent purpose.'") (quoting Jobin v. McKay (In re M&L Business Machine Co., Inc.), 84 F.3d 1330, 1337-38 (10th Cir. 1996) (quoting In re Agric. Research, 916 F.2d at 536)). See also Jobin, 84 F.3d at 1335-36 (explaining that "good faith" includes "freedom from knowledge or circumstances which ought to put the holder on inquiry" (citing In re Sherman, 67 F.3d 1348 (8th Cir. 1995)); id. (stating that "the presence of any circumstance placing the transfer on inquiry as to the financial condition of the transferor may be a contributing factor in depriving the former of any claim to good faith unless investigation actually disclosed no reason to suspect financial embarrassment");[16] In re Bayou Group, 396 B.R. at 844-846 (explaining that transferee is on notice if it knew or should have known of information placing it objectively on alert that there was a potential problem such that transferee should have attempted to learn more); id. at 845 (explaining that support for a finding of notice on the part of transferee is found in the transferee's own reaction to the information it learned);[17] Terry, 432 F.Supp.2d at 641 (explaining that under UFTA transferee must show that he did not have knowledge of facts that should have reasonably put him on notice that transfer was made to delay, hinder or defraud creditor).[18]

---

16. The Jobin Court looked to the transferee's experience, the implausibility of any legitimate explanation, the suspicious nature of the checks, and the transferor's prior history of default/insufficient assets in concluding an absence of good faith.

17. Cf. Plaintiff's Reply to Commercebank's Memorandum of Law in Opposition at 8 (stating that Defendant's assertion that it asked the FBI whether it should accept the transferred funds "further supports Plaintiff's contention that the Defendant was on inquiry notice as it was suspicious of the funds received and Defendant had a duty to investigate").

18. Indeed, this understanding of a good faith defense to a fraudulent transfer appears in a decision of the United States Supreme Court more than a century ago. See Shauer v. Alterton,
(continued...)

The holdings of many of these decisions indicate that a variety of circumstances may preclude a finding of good faith, including notice of (a) the transferor's fraudulent purpose, (b) an underlying fraud, (c) the transferor's unfavorable financial condition or insolvency, (d) the improper nature of a transaction, and/or (e) the voidability of the transfer. See, *e.g.*, id. at 845-46 (providing extensive case citations).[19]

---

18. (...continued)
151 U.S. 607 (1894) (stating that transferee's "knowledge or actual notice of circumstances sufficient to put him, as a prudent man, upon inquiry as to whether his brother intended to delay or defraud his creditors . . . should be deemed to . . . invalidate" the transfer) (quoted in In re Agric. Research, 916 F.2d at 535).

    The Court further notes that the use of the disjunctive in Comment 6, discussed *supra* n. 8, clearly indicates that the comment does not deem fraudulent intent or actual collusion the sole bars to a §5108 defense. Alternatively, under the comment, a transferee cannot invoke the good faith defense where it has acted "without actual fraudulent intent" but "otherwise actively participate[d]" in the debtor's scheme. The comment can therefore by harmonized with the prevailing interpretation of state law codifications of UFTA by considering receipt of funds (a) with knowledge of circumstances that make the transfer suspicious and (b) without investigation/inquiry, to be "other participation" for purposes of the statute. As discussed *infra*, by failing to contact Ameriserv or otherwise investigate when it had objectively clear grounds to question the validity of the $700,000 transfer/source of those funds (in the language of the comment, when it had "knowledge concerning other facts"), Commercebank was effectively complying with Callahan's May 14th correspondence indicating that his communications regarding the pending Ameriserve transaction should be kept secret to enable him to complete financing with Ameriserv and make partial payment to Commercebank four days later.

19. In its thorough and well-reasoned opinion the Bayou Group Court further noted that once on notice of suspicious circumstances regarding a transfer or potential infirmity as to the debtor, the transferee is obligated to conduct a "diligent investigation" which "must ameliorate the issues that placed the transferee on inquiry notice in the first place." A failure to do so is "fatal to its 'good faith' defense." 396 B.R. at 846; id. at 847 (holding that transferee "cannot put his head in the sand", and that taking no steps in response to objectively reasonable grounds for suspicion "amounts to willful ignorance" which defeats the good faith defense) (quoting Gredd v. Bear, Stearns Secs. Corp. (In re Manhattan Inv. Fund), 2007 WL 4440360 at *19 (Bankr. S.D.N.Y. 2007)). See also Development Specialists, Inc. v. Hamilton Bank, N.A. (In re Model Imperial, Inc.), 250 B.R. 776, 798 (Bankr. S.D. Fla. 2000) ("The mere failure to make inquiry in the face of unusual circumstances [ ] is sufficient to preclude a good faith defense."). Cf. HBE Leasing
(continued...)

As fully set forth above, in the case at hand: (1) a Callahan affiliate was in default on its financing with Commercebank; (2) such financing was known by Commercebank to have been fraudulently obtained through a purported Thermo Fisher transaction, and the matter was under federal criminal investigation; (3) Commercebank recently sued Callahan and his affiliates in Texas, alleging, *inter alia,* fraud and forgery; (4) Callahan pursued additional substantial financing from Ameriserv and obtained a commitment for funding related to a purported Home Depot transaction; (5) Callahan communicated the Ameriserv Commitment Letter to Commercebank within three days of the Texas filing; (6) Callahan represented to Commercebank that he would be making repayments when this funding was obtained and that this information should be kept confidential; (7) deposit from an entity known to Commercebank to be a fictitious name for Callahan's corporation CCM, recipient of the Ameriserv financing under the terms of the Ameriserv Commitment Letter, was made four days later; (8) Commercebank was concerned that Ameriserv was the source of these funds but made no inquiry to Callahan or Ameriserv; and (9) Commercebank has acknowledged that the monies it received were proceeds of the Ameriserv transaction.

Clearly, Defendant was in possession of information more than sufficient to affirmatively suggest to a reasonable person that the source of Callahan's loan repayment was an improper use of Ameriserv's funds. Defendant could not, therefore, "sit on [its] heels" and yet

---

19. (...continued)
Corp. v. Frank, 48 F.3d 623, 636 (2d Cir. 1995) (holding that, under New York state law equivalent to Bankruptcy Code's fraudulent transfer provisions, "[c]onstructive knowledge of fraudulent schemes will be attributed to transferees who were aware of circumstances that should have led them to inquire further into the circumstances of the transaction, but who failed to make such inquiry").

retain those funds as a good faith transferee when Ameriserv seeks their recovery.[20]  The evidence proffered demonstrates no triable issue of fact on the matter before this Court for summary judgment, *i.e.*, no reasonable jury could find that Defendant met its burden of proof that it took in good faith within the affirmative defense of § 5108.

Accordingly, the Plaintiff's Motion for Partial Summary Judgment will be granted. An appropriate Order follows.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

Dated: March 26, 2009

---

20. As Plaintiff duly observes, Defendant's cooperation in the FBI's ongoing criminal investigation does not, without more, render it a good faith transferee entitled to retention of fraudulently transferred funds.  The issues of objectively reasonable concern and/or the indicia of the potential impropriety of the transfer were neither addressed nor resolved by Commercebank's confidential communication of information to that Agency.